# EXHIBIT A

974 F.3d 941
United States Court of Appeals, Ninth Circuit.

Emily NANOUK, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.

No. 19-35116
|
Argued and Submitted June 4, 2020 Anchorage, Alaska
|
Filed September 4, 2020

**Synopsis**
**Background:** Property owner brought action against the United States under Federal Tort Claims Act (FTCA) alleging that her property was contaminated by hazardous chemicals negligently released from site of nearby military facility. The United States District Court for the District of Alaska, Ralph R. Beistline, Senior District Judge, dismissed action, and owner appealed.

**Holdings:** The Court of Appeals, Watford, Circuit Judge, held that:

Air Force officials' supervision of contractors' waste disposal practices fell within scope of FTCA's discretionary function exception;

Air Force's decision to abandon site, leaving behind barrels containing hazardous chemicals and allowing their contents to leak into soil, fell within scope of discretionary function exception; but

questions remained as to whether policy considerations underlay government's delay in discovering and remediating "hot spot" of contaminated soil.

Vacated and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Lack of Subject Matter Jurisdiction.

**Attorneys and Law Firms**

Samuel J. Fortier (argued) and Naomi Palosaari, Fortier & Mikko P.C., Anchorage, Alaska, for Plaintiff-Appellant.

Albert K. Lai (argued), Trial Attorney; Bridget B. Lipscomb, Assistant Director; J. Patrick Glynn, Director; Thomas G. Ward, Deputy Assistant Attorney General; Joseph H. Hunt, Assistant Attorney General; Environmental Torts, United States Department of Justice, Washington, D.C.; for Defendant-Appellee.

Appeal from the United States District Court for the District of Alaska, Ralph R. Beistline, District Judge, Presiding, D.C. No. 3:15-cv-00221-RRB

Before: Morgan Christen, Paul J. Watford, and Bridget S. Bade, Circuit Judges.

**OPINION**

WATFORD, Circuit Judge:

This is a suit brought by Emily Nanouk against the United States under the Federal Tort Claims Act (FTCA). She alleges that her property has been contaminated by hazardous chemicals negligently released from the site of a nearby military facility. The district court dismissed Nanouk's suit for lack of subject matter jurisdiction after determining that her claims are barred by the FTCA's discretionary function exception, a provision that precludes jurisdiction when the plaintiff's claims are based on certain discretionary acts of government employees. We agree with the district court that the discretionary function exception bars Nanouk's claims to the extent they are predicated on two of the three acts she challenges as negligent. But on the record before us, the government has not established that the exception bars Nanouk's claims in their entirety. We therefore vacate the judgment dismissing Nanouk's case and remand for further proceedings.

I

Nanouk's property is a 160-acre Alaska Native allotment near the village of Unalakleet, a small community on Norton Sound roughly 400 miles northwest of Anchorage. Since the 1960s, Nanouk has used the property for traditional subsistence activities such as hunting, fishing, and berry-

picking. In the 1980s, Nanouk built a small cabin on her property, which she and her family reached by traveling down a trail that runs from the main road through the site of a former United States Air Force facility known as the North River Radio Relay Station. The station was part of the White Alice Communications System, a network of 70 radio relay sites built during the Cold War to enable early warning of potential Soviet air attacks on the continental United States. By the 1970s, satellite technology had rendered the White Alice system obsolete, leading the Air Force to shut the network down. The North River Station closed in 1978, and the Air Force has not used the site since then.

***2** In the first few years after the North River Station closed, the Air Force did little to monitor the condition of the unmanned site, other than receiving reports from a caretaker sent out to inspect the property on a weekly basis. In 1981, the General Accounting Office issued a report that criticized the Air Force's failure to protect and maintain a number of the shuttered White Alice sites, including the North River Station. The report noted that the sites still contained hazardous chemicals, such as highly toxic polychlorinated biphenyls (PCBs), which could result in environmental contamination or personal injury if not removed. The report prompted the Air Force, with the help of the Army Corps of Engineers, to begin the process of remediating contamination at the North River Station. In 1982, for example, the Army Corps removed 500 gallons of transformer oil containing PCBs from the North River site, and in 1984 it removed some of the PCB-contaminated soil from the site. Surveys taken in 1987 and 1989 revealed that 6,700 cubic yards of contaminated soil remained at the site.

While the Air Force and the Army Corps directed most of their remediation efforts toward other radio relay sites during the 1980s, they turned their attention back to the North River Station in 1990. In 1993, an Army Corps contractor removed some contaminated soil from the station but went out of business before it could finish the remediation. A different contractor then took over in 1995, but also went out of business before completing the job. The Air Force and the Army Corps subsequently released a new action plan for environmental remediation at the North River Station in 2001, and clean-up activities resumed shortly thereafter.

No one knows exactly when, but sometime between the early 1980s and 2003, PCBs migrated from the North River Station onto Nanouk's allotment. The migration occurred because the trail that Nanouk and her family used to access her cabin ran directly through a "hot spot" of PCB-contaminated soil on the North River Station grounds. The vehicles used by Nanouk and her family picked up the PCBs and carried them from the station to Nanouk's allotment, thereby contaminating the soil around her cabin.

Nanouk did not learn about the presence of PCBs on her property until 2003. In July of that year, she informed the Air Force that an area along the trail was marked by a strong chemical odor. The Air Force investigated and found that the soil in the area contained exceptionally high concentrations of PCBs (over 40,000 parts per million), far in excess of levels considered safe. Further testing revealed that PCBs had been spread along the trail from the hot spot to the doorstep of Nanouk's cabin.

The Air Force thereafter undertook extensive environmental remediation to remove PCB-contaminated soil from both the North River Station and Nanouk's allotment. By 2005, the remediation efforts on Nanouk's allotment were complete, as they had reduced PCB contamination to less than one part per million, the level environmental authorities regard as safe even for high-occupancy areas. *See* 40 C.F.R. § 761.61(a)(4)(i)(A). In 2013, Nanouk requested further testing of the soil around her cabin. Those tests confirmed that PCBs, although still present, remained at levels below one part per million.

Nanouk sued the United States in 2015, alleging claims for trespass and nuisance and seeking an award of money damages. Despite assurances from federal and state authorities that her property is safe to use, Nanouk no longer feels comfortable using her allotment for traditional subsistence activities. She and several family members have experienced serious health problems over the years, and Nanouk believes those ailments are attributable at least in part to exposure to PCBs.

After the parties completed discovery, the government filed a motion to dismiss Nanouk's suit for lack of subject matter jurisdiction on the ground that the discretionary function exception bars Nanouk's claims. The district court agreed and dismissed Nanouk's action. [1]

***3** On appeal, Nanouk challenges the district court's conclusion that her claims are barred by the discretionary function exception, a ruling we review de novo. *Gonzalez v. United States*, 814 F.3d 1022, 1028 n.2 (9th Cir. 2016).

II

The FTCA waives the United States' sovereign immunity for claims seeking money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* § 2674. The Act defines the term "employee of the Government" to include employees of the military departments but to exclude employees of independent contractors. § 2671.

The FTCA's broad waiver of sovereign immunity is subject to a number of exceptions, including the discretionary function exception at issue here. That exception preserves the United States' immunity from suit as to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." § 2680(a). The government bears the burden of establishing that the exception applies. *Chadd v. United States*, 794 F.3d 1104, 1108 (9th Cir. 2015).

We employ a two-step test to determine whether the discretionary function exception is applicable. Under the first step, we ask whether the act or omission on which the plaintiff's claim is based was discretionary in nature—that is, whether it "involve[d] an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). If the act did *not* involve an element of judgment or choice, the analysis ends there and the plaintiff's claim may proceed. For "if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect." *Id.*

If the employee's conduct involved an element of judgment or choice, we turn to the second step of the analysis, which asks whether the discretionary decision challenged by the plaintiff "is of the kind that the discretionary function exception was designed to shield." *Id.* Congress sought to preclude courts from second guessing discretionary judgments "grounded in social, economic, and political policy." *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). The government accordingly prevails at step two if it can show that the decision challenged by the plaintiff is "susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

III

Before we can apply the two-step test, we must identify which specific actions or omissions the plaintiff alleges were negligent or wrongful. *Young v. United States*, 769 F.3d 1047, 1053 (9th Cir. 2014). Nanouk predicates her claims on three distinct actions—or, as she describes them in her briefs, governmental "failures"—that she alleges created the hot spot and led to the contamination of her property. First, she contends that during the period of the North River Station's operation (1957–1978), the Air Force failed to prevent PCBs, which are found in used transformer oil, from being dumped on the ground. Second, she asserts that after the station closed, the Air Force and the Army Corps essentially abandoned the site, leaving behind barrels containing PCBs and allowing their contents to leak into the soil. Third, she argues that once the Air Force and the Army Corps redirected their remediation efforts toward the North River Station in 1990, they failed to discover and clean up the hot spot in a timely manner.

*4 As explained below, we agree with the district court that the discretionary function exception bars liability predicated on the first two actions. But at this stage of the proceedings, the government has not established that the exception bars liability predicated on the last of the challenged actions.

A. Disposal of PCBs During the Station's Operation

We begin with Nanouk's contention that the Air Force negligently permitted used transformer oil containing PCBs to be dumped on the ground. One threshold problem with this theory of liability is that the employees who dumped PCBs on the ground were not employees of the government. The Air Force hired private contractors to operate and maintain the North River Station and delegated to them responsibility for disposing of hazardous wastes such as PCBs. Nanouk does not allege that the contractors' employees can be considered employees of the government under the FTCA, so she cannot predicate her claims on the contractors' alleged negligence in dumping PCBs on the ground. *See Logue v. United*

*States*, 412 U.S. 521, 527–28, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). Nanouk instead bases her claims, as she must, on the alleged negligence of Air Force personnel in *supervising* the contractors—in particular, on their failure to detect and stop the contractors' environmentally harmful disposal practices.

At the first step of the analysis, we conclude that the challenged conduct was discretionary in nature. The Supreme Court has held that discretion is absent "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954. Put differently, to be classified as nondiscretionary, the employee's conduct must be governed by a statute, regulation, or policy "directing mandatory and specific action," *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008), which leaves the employee "no rightful option but to adhere to the directive," *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954. In this case, no controlling statute, regulation, or policy specifically prescribed how Air Force personnel were to supervise a contractor's waste disposal practices, much less required Air Force personnel to halt a contractor's dumping of PCBs on the ground. The absence of a mandatory and specific directive of that sort precludes Nanouk from prevailing at step one in the context of a negligent supervision claim. *See Alinsky v. United States*, 415 F.3d 639, 647 (7th Cir. 2005); *Bibeau v. Pacific Northwest Research Foundation, Inc.*, 339 F.3d 942, 945–46 (9th Cir. 2003) (per curiam); *Kirchmann v. United States*, 8 F.3d 1273, 1276 (8th Cir. 1993).

Nanouk's best support for the existence of a mandatory and specific directive is Air Force Regulation 19-1, but that regulation merely established general policies and programs relating to environmental protection. It did not require the Air Force to prohibit independent contractors from dumping PCBs on the ground. As relevant here, the most specific of the regulation's directives required the Air Force to "[m]ake all practical efforts" to "[d]ispose of or discharge pollutants in a manner that will not ... expose people to concentrations of any agent (chemical, physical, or biological) hazardous to health."

There are two reasons why this provision did not mandate that Air Force personnel stop contractors from dumping PCBs on the ground. First, during the period of the North River Station's operation, there were no regulations governing the use and disposal of PCBs; such regulations did not take effect until after the station closed. *See* 43 Fed. Reg. 7150 (Feb. 17, 1978); 44 Fed. Reg. 31514 (May 31, 1979). Second, even if dumping PCBs on the ground had been known to pose health hazards, the provision at issue here required only that Air Force personnel "[m]ake all *practical* efforts" to avoid exposing people to chemicals that could be hazardous to health. That qualifier necessarily left Air Force personnel with discretion to decide whether complying with the directive was feasible under the circumstances at hand. *See Aragon v. United States*, 146 F.3d 819, 824 (10th Cir. 1998) (the phrase "as may be practicable" conferred discretion at step one); *Cope v. Scott*, 45 F.3d 445, 450 (D.C. Cir. 1995) (same for the phrase "to the extent practicable"); *see also Gonzalez*, 814 F.3d at 1030 (the phrase "whenever feasible" conferred discretion at step one).

**\*5** Turning to the second step of the analysis, we conclude that deciding how closely Air Force personnel would supervise the contractors' waste disposal practices "involved the kind of policy judgment that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 332, 111 S.Ct. 1267. Nanouk faults the Air Force for failing to conduct more rigorous inspections of the contractors' operations, but any attempt to find the Air Force negligent based on the level of oversight it exercised would require a court to second guess judgments that are "susceptible to policy analysis." *Id.* at 325, 111 S.Ct. 1267. The Air Force decided from the outset that, given manpower constraints, it could not operate the White Alice system itself, so it hired contractors to maintain and operate all 70 sites "with the minimum governmental support." That judgment obviously influenced how closely Air Force personnel could monitor the contractors' waste disposal practices. The Air Force decided to rely on the contractors' presumed competence in operating the radio relay stations, subject to limited oversight that did not include policing the manner in which contractors disposed of PCBs. Courts have held that similar policy judgments concerning the level of oversight to be exercised over government contractors are protected by the discretionary function exception. *See, e.g.*, *Varig Airlines*, 467 U.S. at 815–16, 819–20, 104 S.Ct. 2755; *Kirchmann*, 8 F.3d at 1277–78.[2]

B. Abandonment of the North River Station

We consider next the government's alleged negligence between 1978, when the North River Station closed, and 1990, when the Air Force and the Army Corps focused their

remediation efforts on the station. Nanouk alleges that after the station's closure, the Air Force essentially abandoned the property, leaving barrels containing PCBs exposed to vandalism and the elements, which allowed the barrels' contents to leak into the soil in the area that later became the hot spot. Although the Air Force and the Army Corps conducted some remediation efforts in the 1980s, Nanouk faults the government for not moving more quickly to secure the barrels, remove them from the site, and clean up the contamination they left behind.

At the first step of the analysis, we again find no mandatory and specific directive governing the government's actions. As the source of such a directive, Nanouk cites a provision of the Federal Property Management Regulations addressing the management of surplus real property held by federal agencies.[3] The provision in effect in the 1980s stated in relevant part: "The holding agency shall retain custody and accountability for excess and surplus real property including related personal property and shall perform the physical care, handling, protection, maintenance, and repairs of such property pending its transfer to another Federal agency or its disposal." 41 C.F.R. § 101-47.402-1 (1980). This provision appeared in a set of regulations designed to protect the government's interest in real property that was no longer needed for its original use, with the aim of ensuring that the government could transfer the property to another federal agency for use, donate the property to a state or local agency, or sell the property and realize its value. *See generally* Utilization and Disposal of Real Property, 41 C.F.R. Part 101-47 (1980). The provision Nanouk cites did not require the Air Force or the Army Corps to prevent barrels containing PCBs from leaking, remove the barrels from the North River Station, or clean up contamination caused by the barrels within a specified timeframe.

**\*6** At the second step of the analysis, we think the government is entitled to prevail as well. Nanouk faults the Air Force and the Army Corps for their delay in addressing what turned out to be serious environmental contamination at the North River Station. But the decisions she challenges as negligent were "based on considerations of public policy." *Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954.

When the Air Force decided to shut down the White Alice Communications System in the 1970s, it had to deal with the closure of dozens of other radio relay stations during the same time period. Faced with limited resources to address environmental contamination at each of those sites, the Air Force decided to conduct remediation on a "worst first" basis, with sites posing graver risks of imminent harm given a higher priority than those posing less serious risks. That decision was dictated by a military-wide policy adopted by the Department of Defense, described as follows: "Because of the large number of sites DoD-wide and extensive investigations and planning that precede cleanup, it is not technically or economically feasible to undertake remedial actions at all sites simultaneously. ... DoD policy is to remediate those sites which pose the greatest potential for damage first." 54 Fed. Reg. 43104 (Oct. 20, 1989). Established in 1983, this policy was known as the Defense Environmental Restoration Program (DERP).

In essence, the military adopted a triage system for addressing a large number of simultaneous demands on finite resources, a policy judgment that necessarily involved the weighing of competing social, economic, and political considerations. As part of this complex calculus, the military had to decide which individuals or communities would be left at risk of environmental harm that could have been avoided in order to avert greater harm elsewhere. That is the kind of policy judgment protected by the discretionary function exception. *See Cope*, 45 F.3d at 450; *Baum v. United States*, 986 F.2d 716, 722 (4th Cir. 1993).

Records are poor for the period during which the government allegedly abandoned the property, but they are consistent with the government's efforts to prioritize cleanup at the various former White Alice sites. Between 1978 and 1982, the government sent a caretaker to inspect the North River site on a weekly basis. Between 1983 and 1985, the Air Force undertook an initial clean-up of the site and removed 500 gallons of PCB-containing transformer oil and PCB-contaminated electrical transformers. While there is little evidence of any activity between 1985 and 1990, the site was surveyed in 1987, and in 1989 the government hired a contractor to visit the site and inspect the soil. This work revealed that 6,700 cubic yards of contaminated soil remained. When the government turned its attention back to the site in 1990, the site received a "low priority" ranking in the DERP program. This record suggests that the government's failure to act more quickly to remediate environmental contamination at the North River Station was attributable to the military's policy judgment to direct its limited resources to sites posing more urgent demands for remediation.

The cases on which Nanouk relies are distinguishable. In each of them, we held that the government could not invoke the discretionary function exception by citing budgetary constraints as the sole reason for its failure to perform routine maintenance or to take routine safety precautions. *See, e.g.*, *Bolt v. United States*, 509 F.3d 1028, 1034 (9th Cir. 2007) (failure to remove snow and ice in a parking lot, on which plaintiff slipped and fell); *Whisnant v. United States*, 400 F.3d 1177, 1183–84 (9th Cir. 2005) (failure to remove toxic mold from the commissary in which plaintiff worked); *O'Toole v. United States*, 295 F.3d 1029, 1036–37 (9th Cir. 2002) (failure to conduct routine maintenance of irrigation ditch, resulting in flooding of plaintiffs' land). As we stated in *O'Toole*, "inadequate funding alone" cannot be sufficient to trigger the discretionary function exception, 295 F.3d at 1037, for otherwise the government could always insulate itself from liability for run-of-the-mill negligence simply by asserting that it chose "to spend its limited funds in other ways," *id.* at 1036.

***7** The key factor in identifying judgments that are protected by the discretionary function exception is the presence of "competing policy considerations" that must be weighed. *Morales v. United States*, 895 F.3d 708, 715 (9th Cir. 2018); *Bibeau*, 339 F.3d at 946; *Miller v. United States*, 163 F.3d 591, 596 (9th Cir. 1998). Thus, particularly when the government is charged with acting or failing to act in a way that jeopardizes safety, there must be a legitimate *policy* consideration on the other side of the balance before the discretionary function exception can be held to apply. In each of the cases on which Nanouk relies, no such competing policy consideration was present. For example, as we observed in *Chadd*, "[w]hat distinguished the mold situation in *Whisnant* is that there was *no* legitimate reason for the commissary not to eliminate the toxic mold." 794 F.3d at 1112. Here, by contrast, there was a legitimate, competing policy consideration underlying the government's failure to address safety concerns at the North River Station more promptly—namely, the need to address simultaneous and more urgent safety concerns presented by environmental contamination at sites assigned a higher priority ranking.[4]

Because the government's decision to prioritize more dangerous sites for remediation ahead of the North River Station involved the weighing of competing policy considerations, it is protected by the discretionary function exception.

C. Delay in Remediating the Hot Spot

Finally, we address Nanouk's allegation that, once the government turned its attention to the North River Station in 1990, it negligently failed to discover and clean up the hot spot in a timely manner. As noted earlier, the contractor that the Army Corps initially hired to conduct remediation efforts at the station went out of business before completing the clean-up, as did the replacement contractor. Although a third contractor eventually resumed the clean-up, the government did not discover the hot spot until 2003–13 years after the government first directed its remediation efforts toward the North River Station. Nanouk faults the government for failing to identify the hot spot sooner, on the theory that such failure caused, or at least contributed to, the contamination of her property.

With respect to the first step of the analysis, we conclude that the government had discretion to decide when and how to conduct the remediation, as no mandatory and specific directive required the government to complete the process within a specific timeframe. Nanouk does not contend otherwise.

At the second step of the analysis, however, we are unable to determine whether the government's decisions were "grounded in social, economic, and political policy." *Varig Airlines*, 467 U.S. at 814, 104 S.Ct. 2755. The government insists that the discretionary function exception applies, but it has not identified any competing policy considerations underlying the 13-year delay in discovering the hot spot and commencing removal of PCBs from the affected area. Instead, the government makes a general appeal to limited resources, and focuses on its decision in the 1980s to prioritize sites posing graver risks of environmental harm. While such policy considerations warrant application of the discretionary function exception to Nanouk's second theory of liability, they do not automatically shield the government from liability for subsequent delays. By 1990, the Air Force and the Army Corps had decided to direct remediation efforts toward the North River Station, presumably after having addressed sites with more pressing environmental safety concerns. As the record stands now, it appears that once the government reached that decision in 1990, its failure to conduct the clean-up in a timely manner thereafter was "not the result of a policy

choice," but "simply a failure to effectuate policy choices already made." *Camozzi*, 866 F.2d at 290.

**\*8** Of course, the government may have been conducting environmental remediation at higher priority sites throughout the 13-year period of delay, thus preventing it from directing sufficient resources to the North River Station. If so, the discretionary function exception might protect the government's weighing of competing policy considerations for the reasons explained above. But the government has not made any factual showing along those lines, and the record does not disclose whether the delay in pursuing remediation at the North River Station involved decisions "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267. Accordingly, at this stage of the proceedings, the government has failed to demonstrate that the discretionary function exception applies to Nanouk's third theory of liability. *See Chadd*, 794 F.3d at 1108.

\* \* \*

The discretionary function exception protects the government's alleged failure to supervise contractors during the North River Station's operation, as well as its abandonment of the property between the station's closure in 1978 and 1990. However, based on the current record, we cannot conclude that the discretionary function exception also applies to the government's failure to identify and remediate the hot spot in a timely manner after 1990. For that reason, we vacate the district court's judgment dismissing Nanouk's action for lack of subject matter jurisdiction and remand the case for further proceedings.

Nanouk's motion to strike the government's Supplemental Excerpts of Record (Dkt. No. 19) is **DENIED**.

**VACATED and REMANDED.**

The parties shall bear their own costs.

**All Citations**

974 F.3d 941, 2020 WL 5268922, 20 Cal. Daily Op. Serv. 9277, 2020 Daily Journal D.A.R. 9749

---

**Footnotes**

1 In its motion to dismiss, the government invoked what it characterized as three FTCA jurisdictional provisions: the discretionary function exception, the FTCA's "exclusion" of liability for the acts of independent contractors, and the Act's "exclusion" of liability on the basis of strict liability. On appeal, the government argues that the district court relied on all three provisions. But Nanouk's claims were not predicated upon vicarious liability for the acts of independent contractors, nor were they based on strict liability. Thus we do not read the district court's order as referring to these theories.

2 This case differs from *Camozzi v. Roland/Miller & Hope Consulting Group*, 866 F.2d 287 (9th Cir. 1989), on which Nanouk relies. There the government retained responsibility for overseeing the contractor's compliance with safety precautions, including responsibility for conducting daily inspections of any floor openings at the work site (the hazard that caused the plaintiffs' injuries). *Id.* at 288–89. "Failure to inspect floors for uncovered and unguarded openings," we held, "was not the result of a policy choice by the particular employees or agents involved. It was simply a failure to effectuate policy choices already made and incorporated in the contracts." *Id.* at 290.

3 For the first time in her reply brief, Nanouk also cites in passing § 6(e)(2)(A) of the Toxic Substances Control Act of 1976, which addresses the regulation of PCBs. *See* 15 U.S.C. § 2605(e)(2)(A). However, she fails to develop any argument explaining why that provision qualifies as a mandatory and specific directive relevant here. We therefore deem any such argument forfeited and express no view on the issue.

4 We are mindful that, in the district court and on appeal, the government erroneously relied on a report pertaining to an entirely different location called "North River Recreation." The North River Recreation site

is a spot by a river that service members used to fish and recreate. It had little debris and no reported PCB contamination; no PCBs were stored there. The North River Recreation report is not factored into our analysis.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.