1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    Rio Linda Elverta Community Water District,          No. 2:17-cv-01349-KJM-CKD

12                         Plaintiff,                       ORDER

13          v.

14    The United States of America, et al.,

15                         Defendants.

16    _____

17    Sacramento Suburban Water District,                 No. 2:17-cv-1353-KJM-KJN

18                         Plaintiff,                       ORDER

19          v.

20    Elementis Chromium Inc., et al.,

21                         Defendants.

22

23          There are two motions pending in these two related cases.  First, the United States moves

24    to dismiss the claims against it.  The court **grants that motion, in part**.  Second, the remaining

25    defendants move to dismiss the nuisance, trespass, and utility tampering claims against them.

26    The court **grants that motion** with leave to amend.  The court's reasoning is provided below.

27    /////

1

1    **I.     BACKGROUND**

2         The court previously related the two matters captioned above, brought by Rio Linda

3    Elverta Community Water District and Sacramento Suburban Water District, respectively. *See*

4    Rio Linda Related Case Order, ECF No. 9.  As the material allegations in the complaints and the

5    pending motions in each case are virtually identical, the court resolves both motions here in a

6    single order.  In doing so, the court cites primarily to the docket in the Rio Linda case, with

7    citations added to the docket of the Sacramento Suburban case where needed to identify material

8    differences.[1]

9         The plaintiffs are water utilities whose water supplies are derived from municipal wells,

10   "which draw from the local groundwater aquifer."  Rio Linda First Am. Compl. (FAC) ¶ 30, ECF

11   No. 116.  The plaintiffs' service areas are adjacent to land formerly operated as McClellan Air

12   Force Base and the base "overlies the same groundwater aquifer" the plaintiffs rely on for water.

13   *Id.* ¶¶ 34–35.  Plaintiffs' drinking water supplies are contaminated by hexavalent chromium

14   (Cr6).  *Id.* ¶¶ 1–2.

15        The defendants are the United States of America and a group collectively called the

16   "supplier defendants."[2]  *Id.* ¶ 3.  During active operations, the federal government "used products

17   containing Cr6 at McClellan Air Force Base," *id.* ¶ 4, and it has been cleaning up hazardous

18   contamination on the base since 1979, *id.* ¶ 73.  The supplier defendants are "manufacturers and

19   distributors of industrial products that contain Cr6," *id.* ¶ 3, which were sold to the government

20   for use at McClellan, *id.* ¶¶ 9–10.

21   /////

---

[1] The Sacramento Suburban case has additional docket entries, meaning although the documents relevant to these pending motions are identical, they are not located at the same ECF numbers on both dockets.  For example, the government's motion to dismiss is filed on the Rio Linda docket at ECF No. 129, while on the Sacramento Suburban docket it is filed at ECF No. 135.

[2] The supplier defendants include: PPG Industries, Inc., Elementis Chromium Incorporated, Occidental Chemical Corporation, BASF Corporation, E.I. Du-Pont de Nemours and Company, Luxfer Holdings PLC, Sigma-Aldrich Corporation, The Dow Chemical Company, Honeywell International, Inc., Univar USA Inc., Corteva, Inc., and DuPont de Nemours, Inc.  Rio Linda FAC ¶¶ 11–23.

1    Plaintiffs allege the Cr6 used at the base "enter[ed] the groundwater aquifer where it

2  migrated into the Districts' nearby drinking water production wells." *Id.* ¶ 4.  And while the

3  government "has engaged in mandatory cleanup of contaminants located underneath McClellan

4  . . . [which cleanup has] addressed multiple contaminants, including Cr6, known to have

5  infiltrated the subsurface and groundwater underlying the Base," there has been no "remediation

6  beyond the surface boundaries of the Base." *Id.* ¶ 73.  Accordingly, plaintiffs claim any cleanup

7  efforts implemented thus far have not been "designed or intended to address [the] off-Base

8  contamination" affecting plaintiffs.  *Id.*  Plaintiffs therefore "seek[] to recover the substantial

9  costs necessary to protect the public and restore [their] damaged drinking water. . . ." *Id.* ¶ 1.

10  Plaintiffs allege 1) imminent and substantial endangerment against the United States under the

11  Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a)(1)(B); 2) negligence

12  against all defendants; 3) nuisance against all defendants; 4) trespass against all defendants;

13  5) strict liability based on design defect against supplier defendants; 6) strict liability based on

14  failure to warn against supplier defendants; 7) utility tampering in violation of California Civil

15  Code section 1882 against all defendants; and 8) cost recovery against the United States under the

16  Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA),

17  42 U.S.C. § 9607(a).

18    The United States moves to dismiss the first seven claims against it for lack of subject

19  matter jurisdiction and the last CERCLA claim for failure to state a claim.  Mot. to Dismiss (U.S.

20  MTD), ECF No. 129.  The motion is fully briefed.  U.S. Opp'n, ECF No. 139; U.S. Reply, ECF

21  No. 141.

22    The supplier defendants move to dismiss the nuisance, trespass, and utility tampering

23  claims -- claims three, four and seven, respectively, of the Rio Linda district's first amended

24  complaint and of Sacramento Suburban's third amended complaint.  *See* ECF No. 122 (Sac.

25  Suburban TAC); PPG Mot. to Dismiss (PPG MTD), ECF No. 131.  This motion also is fully

26  briefed.  PPG Opp'n, ECF No. 140; PPG Reply, ECF No. 142.

27  /////

## II.   GOVERNMENT MOTION TO DISMISS FOR LACK OF JURISDICTION

The United States moves under Federal Rule of Civil Procedure 12(b)(1) to dismiss the plaintiffs' claims brought under RCRA and state law.  It makes a factual attack, asserting a lack of subject matter jurisdiction with respect to the RCRA claim; it invokes sovereign immunity in response to the state law claims.

### A.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(1), a motion to dismiss contests the court's subject matter jurisdiction.  *See, e.g., Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039-40 (9th Cir. 2003).  Standing to sue is a necessary component of the court's subject matter jurisdiction.  *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).  Accordingly, if a plaintiff lacks standing, the court lacks subject matter jurisdiction.  *Id*.  To demonstrate standing, a plaintiff must (1) have suffered a concrete and particularized injury-in-fact, which is actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the defendant's conduct; and (3) it must be likely that the injury will be redressed by a favorable decision.  *Pritikin v. Dep't of Energy*, 254 F.3d 791, 796–97 (9th Cir. 2001).  "The party asserting federal jurisdiction bears the burden" of demonstrating he has standing at every stage of litigation.  *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1141 (9th Cir. 2010).

### B.   RCRA (Claim 1)

Plaintiffs' first claim under the RCRA includes a request for an injunction.  Rio Linda FAC at 41 (Prayer for Relief).  The United States argues the claim is prohibited by § 113 of CERCLA.

The "RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996) (citation omitted); *see* 42 U.S.C. § 6902 et seq.  "Its purpose is to minimize the present and future threat to human health and the environment, not effectuate the clean-up of toxic waste sites or allocate those costs." *City of Fresno v. United States*, 709 F. Supp. 2d 888, 897 (E.D. Cal. 2010) (citing 42 U.S.C. § 6902(b)); *see also Meghrig*, 516 U.S. at 483.  The RCRA allows for citizen

1    suits to obtain a "mandatory injunction, i.e., one that orders a responsible party to 'take action' by

2    attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, i.e., one

3    that 'restrains' a responsible party from further violating RCRA." *Meghrig*, 516 U.S. at 484.  But

4    certain ongoing § 104 CERCLA cleanups cannot be challenged in federal court.  *See McClellan*

5    *Ecological Seepage Situation (MESS) v. Perry*, 47 F.3d 325, 329 (9th Cir. 1995) (citation

6    omitted); *see* 42 U.S.C. § 9604.

7         "CERCLA was enacted to protect and preserve public health and the environment by

8    facilitating the expeditious and efficient cleanup of hazardous waste sites." *Carson Harbor Vill.,*

9    *Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001).  Actions initiated under § 104, which the

10   court refers to here as "removal" actions,[3] are protected under § 113(h) of the CERCLA[4] "from

11   lawsuits that might interfere with the expeditious cleanup effort." *MESS*, 47 F.3d at 329.  Section

12   113 "precludes 'any challenges' to CERCLA Section 104 clean-ups, not just those brought under

13   other provisions of CERCLA," *id.* at 328, effecting a "blunt withdrawal of federal jurisdiction,"

14   *id*.  There are five exceptions to this jurisdictional bar, *see* 46 U.S.C. § 9613(h),[5] but none applies

---

[3] Section 104 provides for both "[r]emoval and other remedial action by President." 42 U.S.C. § 9604(a) (subsection title).  Here the groundwater contamination issues underlying plaintiffs' claims all are related to "removal" activity.  Given this context, for the sake of clarity, the court uses the term "removal" in connection with § 104, and "remedial" solely in reference to activities the EPA has initiated under 42 U.S.C. § 9620.

[4] Section 113 provides that "[n]o Federal court shall have jurisdiction under Federal . . . or . . . State law . . . to review any challenges to removal or remedial action selected under section 9604 . . . , or to review any order issued under section 9606(a)."  42 U.S.C. § 9613(h).

[5] The exceptions include:

(1) An action under section 9607 of this title to recover response costs or damages or for contribution.

(2) An action to enforce an order issued under section 9606(a) of this title or to recover a penalty for violation of such order.

(3) An action for reimbursement under section 9606(b)(2) of this title.

(4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter.  Such

1    here.  *See, e.g., Shea Homes Ltd. P'ship v. United States*, 397 F. Supp. 2d 1194, 1202 (N.D. Cal.

2    2005).  Therefore, as the Ninth Circuit has clarified, this court's ability to exercise jurisdiction

3    over these cases turns on the answer to two questions.  *See Razore v. Tulalip Tribes of*

4    *Washington*, 66 F.3d 236, 239 (9th Cir. 1995).  First, is the McClellan cleanup a "removal action"

5    under § 104?  If it is, the court must proceed to the second question: are the plaintiffs' claims

6    "challenging" the cleanup.  *Id.*   If the answer to both questions is yes, then the jurisdictional bar

7    of § 113 applies.

8              **1.       Section 104 Action?**

9          The first question the court must answer, then, is whether the McClellan cleanup is a

10   removal action under § 104.  "The text of § 113(h) . . . preclude[s] challenges to a CERCLA

11   *removal* action on federal property, . . . [b]ut . . . [does] not preclude challenges to a CERCLA

12   *remedial* action, because such actions are conducted under § 120's grant of authority."[6]  *Fort Ord*

---

an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

(5) An action under section 9606 of this title in which the United States has moved to compel a remedial action.

42 U.S.C. § 9613(h))

[6] Section 120 provides:

Not later than 6 months after the inclusion of any facility on the National Priorities List, the department, agency, or instrumentality which owns or operates such facility shall, in consultation with the Administrator and appropriate State authorities, commence a remedial investigation and feasibility study for such facility.

The Administrator shall review the results of each investigation and study conducted. . . .  Within 180 days thereafter, the head of the department, agency, or instrumentality concerned shall enter into an interagency agreement with the Administrator for the expeditious completion by such department, agency, or instrumentality of all necessary remedial action at such facility. . . .

Remedial actions at facilities subject to interagency agreements under this section shall be completed as expeditiously as practicable.

42 U.S.C. § 9620(e).  Section 113 withdraws a federal court's jurisdiction "to review any challenges to removal or remedial action selected under section 9604."  *Id.* § 9613(h).  But the language of § 113 does not include any similar withdrawal of jurisdiction as to § 9620 actions.

1  *Toxics Project, Inc. v. California E.P.A.*, 189 F.3d 828, 834 (9th Cir. 1999) (emphasis in

2  original).  "CERCLA defines a removal action to include 'such actions as may be necessary to

3  monitor, assess, and evaluate the release or threat of release of hazardous substances . . . .'"

4  *Razore*, 66 F.3d at 239 (quoting 42 U.S.C. § 9601(23)).  Meanwhile, "remedial action," as

5  contemplated by § 120,

> 6  means those actions consistent with permanent remedy taken instead of or in
> 7  addition to removal actions in the event of a release or threatened release of a
> 8  hazardous substance into the environment, to prevent or minimize the release of
> 9  hazardous substances so that they do not migrate to cause substantial danger to
> 10  present or future public health or welfare or the environment.

11  42 U.S.C. § 9601(24).[7]  Fundamentally, "[a]s these definitions indicate, removal actions are

12  designed to effect an interim solution to a contamination problem, while remedial actions are

13  designed to effect a permanent solution." *Price v. U.S. Navy*, 39 F.3d 1011, 1016 (9th Cir. 1994)

14  (citation omitted).

15        The Ninth Circuit previously has considered activities at McClellan Air Force Base,

16  noting that clean-up efforts were initiated "under the authority of the Department of Defense's

17  Installation Restoration Program, pursuant to CERCLA Section 104." *MESS*, 47 F.3d at 327.

18  Thus, one might conclude the Circuit characterized the cleanup at McClellan as a removal action

19  conducted under § 104.  However, the Circuit's decision in the *MESS* case preceded its

20  articulation of the distinction between removal and remedial actions in *Fort Ord*.  And "[t]here

21  are both ongoing removal and remedial actions at McClellan . . . ."  U.S. MTD at 4; U.S. Opp'n at

---

[7] The statute goes on to provide, in pertinent part, that the term "remedial action"

includes, but is not limited to, such actions at the location of the release as storage,
confinement, perimeter protection using dikes, trenches, or ditches, clay cover,
neutralization, cleanup of released hazardous substances or contaminated materials,
recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging
or excavations, repair or replacement of leaking containers, collection of leachate
and runoff, onsite treatment or incineration, provision of alternative water supplies,
and any monitoring reasonably required to assure that such actions protect the public
health and welfare and the environment....

42 U.S.C. § 9601(24).

1    14 nn.3–4.  Thus, the question for jurisdictional purposes is whether the plaintiffs target the

2    government's removal activity authorized under § 104 or its remedial activity authorized under

3    § 120.  Under the RCRA, the Environmental Protection Agency (EPA) promulgates regulations

4    related to the identification, listing, generation, transportation, treatment, storage, and disposal of

5    hazardous waste.  42 U.S.C. §§ 6921–6926; EPA, *Resource Conservation and Recovery Act*

6    *(RCRA) and Federal Facilities*.[8]  Under CERCLA, "the Administrator of the EPA [has] the

7    'authority to conduct remedial actions on federal property'" based on § 120.  *Shea Homes Ltd.*

8    *P'ship*, 397 F. Supp. 2d at 1202 (quoting 42 U.S.C. § 9620(e)(2)) (emphasis omitted).  This

9    authority may not be transferred to any other person, including the President.  42 U.S.C.

10   § 9620(g).  Ordinarily, evidence that the EPA authorized the conduct and listed the cleanup on the

11   National Priorities List (NPL) indicates the EPA has invoked § 120 authority, meaning it is aware

12   of the site and considering the need for remediation.  *City of Fresno*, 709 F. Supp. 2d at 905; *Shea*

13   *Homes Ltd. P'ship*, 397 F. Supp. 2d at 1202; *La Loma Grande LLC v. United States*, No. 11-476,

14   2013 WL 11834724, at *4 (D. Ariz. Jan. 3, 2013).  As relevant here, in 1990, the Air Force

15   entered into "an Interagency Agreement, also known as a Federal Facilities Agreement (FFA),"

16   with the EPA acting under its exclusive § 120 authority.  Response to U.S. Statement of Facts

17   (SOF) ¶ 5, ECF No. 139-1 (citations omitted).  Previously, in 1987, the EPA had listed McClellan

18   on the NPL.  *Id.* ¶ 4 (citations omitted).  The plaintiffs insist that "the only extant removal action

19   at McClellan cited by the United States is a soil excavation project to address radionuclide

20   contamination."  U.S. Opp'n at 14 n.3.  However review of the record shows that the EPA's

21   remedial actions at McClellan include excavation and disposal of contaminated soil, restrictions

22   on land use, and monitoring to prevent harm to human health and the environment.  U.S. MTD

23   Ex. 20 at 12–13, ECF No. 129-5 (EPA's 2015 Record of Decision) (emphasis added).  While the

24   efforts to address soil contamination appear remedial in nature, the plaintiffs' claims are focused

25   solely on how groundwater contamination has impacted their wells.

26   /////

---

[8] https://www.epa.gov/enforcement/resource-conservation-and-recovery-act-rcra-and-federal-facilities (accessed 8/11/2022).

Specifically, plaintiffs do not target the EPA's remedial actions regarding the contaminated soil.  *See* U.S. Opp'n at 12–13 ("The Districts seek removal of Cr6 from their wells, *not from soil* or groundwater at the Base.") (emphasis added).  Rather, plaintiffs claim the government's actions "caused Cr6 to enter the groundwater aquifer where it migrated into the [plaintiffs'] nearby drinking water production wells," Rio Linda FAC ¶ 4, and they seek to have the government address the effects the groundwater contaminants have had on their wells, *see id.* ¶ 73.  The record shows that the efforts to address groundwater contamination—including installation of "a groundwater extraction and treatment system," SOF ¶ 3, and "removal action to prevent groundwater contamination from reaching two drinking water wells," *id.* ¶ 8—all were completed by the Air Force under its § 104 authority.  As the government is addressing groundwater contamination -- the only thing at issue given plaintiffs' claims -- under its § 104 removal authority, the plaintiffs appear to have pled themselves out of relying on the mere fact that § 120 remedial actions are taking place at McClellan as a means of avoiding the jurisdictional bar of § 113.  Furthermore, the plaintiffs do not provide the court with any case law supporting the conclusion that the sole fact that § 120 actions are taking place on a cleanup site, in tandem with §104 removal actions, means that § 113 is inapplicable.  The plaintiffs have not demonstrated that the mere conduct of remedial actions at the site, which appear unrelated to plaintiffs' claims, means the court must find that § 113's jurisdictional bar does not apply.  Based on plaintiffs' own pleading, the court concludes the plaintiffs' claims are directed to the government's removal action under § 104.

The court thus proceeds to the next question.

## 2.      Plaintiffs' Claims a "Challenge" to Cleanup?

The second question the court must answer is whether plaintiffs' claims are properly understood as "challenges."  In performing this task, the court must decide "which, if any, of the claims actually comprise 'challenges' to the cleanup within the meaning of the statute." *MESS*, 47 F.3d at 329.  "[E]very action that increases the cost of a cleanup or diverts resources or personnel from it does not thereby become a 'challenge' to the cleanup." *Id.* at 330; *Fort Ord*, 189 F.3d at 831 ("Congress did not want § 113(h) to serve as a shield against litigation that is

1    unrelated to disputes over environmental standards.").  Rather, a claim amounts to a challenge if

2    it is "related to the goals of the cleanup" or seeks "to improve on the CERCLA cleanup."  *MESS*,

3    47 F.3d at 330.  Specifically, the Ninth Circuit has "found actions to challenge CERCLA

4    cleanups where the plaintiff seeks to dictate specific remedial actions, . . . to postpone the

5    cleanup, . . . to impose additional reporting requirements on the cleanup, . . . or to terminate the

6    [Remedial Investigation/Feasibility Study] and alter the method and order of cleanup."  *ARCO*

7    *Env't Remediation, L.L.C. v. Dep't of Health & Env't Quality of Montana*, 213 F.3d 1108, 1115

8    (9th Cir. 2000) (citations omitted).

9          Plaintiffs argue they are not presenting a "challenge" because they "do not seek additional

10   requirements for the McClellan cleanup, . . . [r]ather, they seek a discrete remedy for a discrete

11   outgrowth of that contamination, which is not the subject of ongoing removal or remedial

12   actions."  U.S. Opp'n at 10.  The government disagrees, arguing the requested injunctive relief

13   would amount to an additional requirement and impose an added goal on the cleanup, constituting

14   a "challenge."  U.S. MTD at 5 (citing *MESS*, 47 F.3d at 330).  As the government's efforts

15   already include treating the contaminated groundwater that has leached into the plaintiffs' wells,

16   any request by the plaintiffs that the government "improve" or expand the geographical bounds of

17   its efforts amounts to a challenge.  *See* Rio Linda FAC at 41 (Prayer for Relief) (demanding

18   "[i]njunctive and equitable relief to compel [d]efendants to . . . remov[e] Cr6 from Plaintiff's

19   water system"); *MESS*, 47 F.3d at 330 ("MESS, for all practical purposes, seeks to improve on

20   the CERCLA cleanup as embodied in the Interagency Agreement.  Its action qualifies as a

21   "challenge" to the cleanup.").

22         Thus, the RCRA claim is barred by § 113 of CERCLA.

23         **C.     State Law Claims (Claims 2, 3, 4 and 7)**

24         Plaintiffs also bring the four state law tort claims identified above against the United

25   States: negligence, nuisance, trespass and utility tampering, all resting on the government's

26   maintenance of "its waste disposal system, . . . , and [ ] failure to adequately characterize the

27   plume of Cr6 emanating from McClellan."  U.S. Opp'n at 21.  The government moves to dismiss

28   /////

10

1   all of these claims arguing this court lacks jurisdiction based on sovereign immunity.  U.S. MTD

2   at 14.

3           This court's jurisdiction over the United States depends on the United States' consent to

4   be sued.  *United States v. Mitchell*, 445 U.S. 535, 538 (1980) U.S. Const. amend. XI.  The FTCA,

5   providing a limited waiver of sovereign immunity, makes the government liable for certain torts.

6   *United States v. Orleans*, 425 U.S. 807, 813 (1976); 28 U.S.C. § 2674.  The FTCA also contains

7   several exceptions.  *See* 28 U.S.C. § 2680(a)–(n).  Under the "discretionary function" exception,

8   the government may not be liable for acts grounded in public policy considerations that involve

9   an element of judgment.  *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991) (citation

10  omitted); 28 U.S.C. § 2680(a).  This exception "insulates certain governmental [decision-making]

11  from judicial second guessing of legislative and administrative decisions grounded in social,

12  economic, and political policy through the medium of an action in tort."  *Myers v. United States*,

13  652 F.3d 1021, 1028 (9th Cir. 2011) (internal citations omitted).  "[A] waiver of the Government's

14  sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign[.]"

15  *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 491–92 (2006) (citation omitted).  While the Ninth

16  Circuit has held "the FTCA was created by Congress with the intent to compensate individuals

17  harmed by government negligence, and as a remedial statute, it should be construed liberally, and

18  its exceptions should be read narrowly," *Terbush v. United States*, 516 F.3d 1125, 1135 (9th Cir.

19  2008) (internal quotations omitted), the Supreme Court has observed that "unduly generous

20  interpretations of the exceptions run the risk of defeating the central purpose of the statute[.]"

21  *Dolan*, 546 U.S. at 491–92 (citations omitted).  Thus, "the proper objective of a court attempting

22  to construe one of [the exceptions of the FTCA] is to identify 'those circumstances which are

23  within the words and reason of the exception'—no less and no more."  *Id.* (citations omitted); *but*

24  *see United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992) (observing "[w]e have on

25  occasion narrowly construed exceptions to waivers of sovereign immunity where that was

26  consistent with Congress' clear intent, as in the context of the 'sweeping language' of the

27  [FTCA]").

28  /////

11

A plaintiff bears the burden of showing the court has subject matter jurisdiction over claims against the federal government in light of the FTCA's waiver of immunity. *Prescott v. United States*, 973 F.2d 696, 701–02 (9th Cir. 1992). The United States, however, has the burden of proving one of the FTCA's exceptions to the waiver of immunity applies. *Id.* Here, the government disputes whether the utility tampering claim falls within the FTCA's waiver of sovereign immunity. U.S. MTD at 32–33. It argues the claim is pled as a strict liability claim, which does not allow it to come within the FTCA waiver. *Id.*; *see Laird v. Nelms*, 406 U.S. 797, 803 (1972) ("the [FTCA] did not authorize the imposition of strict liability of any sort upon the Government"). The plaintiffs do not respond and therefore do not meet their burden of showing a waiver of immunity with respect to this claim. The utility tampering claim is dismissed.

Turning to the other state tort claims of negligence, nuisance and trespass, the government argues the discretionary function exception applies, which turns on a two-part test set forward in *Gaubert*, 499 U.S. at 322–25. If both steps are satisfied, the exception applies even if the ultimate decision reflects an abuse of discretion. *Terbush*, 516 F.3d at 1130 (citing 28 U.S.C. § 2680(a)).

First, a court asks whether the challenged action was discretionary, "i.e., whether it was governed by a mandatory statute, policy, or regulation." *Whisnant v. United States*, 400 F.3d 1177, 1180–81 (9th Cir. 2005). The exception will not apply if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," and a mandatory directive ends the inquiry because the employee "has no rightful option but to adhere to the directive." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Here the plaintiffs claim a mandatory regulation governs employee actions, based on the Air Force Manual (AFM) 85-14 (1959), *Maintenance and Operation of Sewage and Industrial Plants and Systems*. U.S. Opp'n at 24 (citing AFM, U.S. Ex. 54, ECF No. 129-7).

The AFM provides that "industrial waste plants and systems" "shall be maintained to insure their ability to perform their required functions at all times, to prevent them from deteriorating in value and usability." AFM 85-14 at 183. Additionally, the AFM requires that "industrial waste collection systems shall be maintained at the level necessary for the collection and prompt removal of waste liquids from the point of origin to the place of treatment or disposal

1   in a sanitary and satisfactory manner."  AFM 85-14 at 183.  And "[s]ewage and industrial waste

2   plant facilities shall be maintained at that level that will provide protection against deterioration,

3   accidents, and mechanical injury."  *Id*.  This court previously has considered the provisions of

4   AFM 85-14 at length in *The City of Lincoln v. United States*.  283 F. Supp. 3d 891, 901 (E.D. Cal.

5   2017).  It concluded then that the AFM 85–14 sections on "Sewage, Refuse and Industrial Waste

6   . . . emphasized principles rather than practices, and did not prescribe specific and mandatory

7   waste water disposal methods or treatment procedures."  *Id.* (citations omitted).  The court finds

8   no reason to revisit this conclusion, and continues to find the manual's provisions provide "no

9   basis to conclude the United States was subject to any applicable, specific and mandatory course

10   of conduct regarding its disposal of hazardous waste."  *Id.* at 903; *see also Starrett v. United*

11   *States*, 847 F.2d 539, 540 (9th Cir. 1988) (finding the discretionary function exception applied

12   where the plaintiffs did not violate a "specific mandatory" requirement "chemicals from the Navy

13   Base produced during the demilitarization [ ] of missiles" leached into the groundwater and

14   contaminated plaintiffs' domestic water well).

15          Second, the court asks whether the challenged action is of the type Congress meant to

16   protect, "i.e., whether the action involves a decision susceptible to social, economic, or political

17   policy analysis."  *City of Lincoln*, 283 F. Supp. 3d at 904 (citing *O'Toole v. United States*,

18   295 F.3d 1029, 1033–34 (9th Cir. 2002)).  "The focus of the [second step] inquiry is not on the

19   agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the

20   nature of the actions taken and on whether they are susceptible to policy analysis."  *Gaubert*,

21   499 U.S. at 324–25.  "Government actions can be classified along a spectrum, ranging from those

22   'totally divorced from the sphere of policy analysis,'. . . to those "fully grounded in regulatory

23   policy[.]'"  *Whisnant*, 400 F.3d at 1181 (citation omitted).  "But determining the appropriate

24   place on the spectrum for any given government action can be a challenge."  *Id*.  The Ninth

25   Circuit has "distinguish[ed] between design and implementation," with the former being

26   "shielded by the discretionary function exception" and the latter generally not.  *Id*.  The Circuit

27   has also found that "matters of scientific and professional judgment—particularly judgments

28   /////

13

1    concerning safety—are rarely considered to be susceptible to social, economic, or political

2    policy." *Id.*

3        Here plaintiffs contend the government was "negligen[t] in maintaining its waste disposal

4    system" and "fail[ed] to adequately characterize the plume of Cr6 emanating from McClellan."

5    U.S. Opp'n at 21.  Specifically, the plaintiffs allege that "[h]aving undertaken the responsibility

6    of conveying and treating industrial waste containing Cr6," the government had a responsibility

7    to "adhere to safety and technical standards in inspecting, maintaining, and operating the

8    industrial wastewater line and associated equipment."  Rio Linda FAC ¶ 70.

9        As this court has previously observed, "[n]umerous courts, analyzing the military's

10   allocation of resources involving waste management during the 1950s and '60s, have found those

11   decisions susceptible to policy analysis."  *City of Lincoln*, 283 F. Supp. 3d at 904 (collecting

12   cases); *OSI, Inc. v. United States*, 285 F.3d 947, 953 (11th Cir. 2002) ("The nature of the

13   military's function requires that it be free to weigh environmental policies against security and

14   military concerns."); *see also Aragon v. United States*, 146 F.3d 819, 826 (10th Cir. 1998) ("The

15   Base operated under military exigencies during World War II, the Korean Conflict, the Vietnam

16   Conflict, and the Cold War.  Operational decisions during this twenty-five year active period

17   undoubtedly were subject to defense and security considerations which encompass the heart of

18   military policy.").  In contrast, courts have noted that cases involving "minor or routine

19   maintenance" decisions "do not implicate the same kinds of policy judgments that arise when

20   evaluating and responding to public health and environmental hazards."  *Shea Homes Ltd. P'ship*,

21   397 F. Supp. 2d at 1200.  Although the Ninth Circuit appears not to have addressed the

22   application of the discretionary function in cases analogous to this one, it has "generally held that

23   once the Government has undertaken responsibility for the safety of a project, the execution of

24   that responsibility is not subject to the discretionary function exception."  *Marlys Bear Med. v.*

25   *U.S. ex rel. Sec'y of Dep't of Interior*, 241 F.3d 1208, 1215 (9th Cir. 2001); *see also Whisnant*,

26   400 F.3d at 1182 (citation omitted) ("The decision to adopt safety precautions may be based in

27   policy considerations, but the implementation of those precautions is not. . . .  [S]afety measures,

28   once undertaken, cannot be shortchanged in the name of policy.").

1    Despite the plaintiffs' allegations, the government's decisions and actions at issue here

2    involve more than routine "maintenance" or mere implementation of safety precautions once a

3    project is adopted.  Rather, they are decisions that "involved policy choices of the most basic

4    kind."  *Aragon*, 146 F.3d at 826; *compare Bolt v. United States*, 509 F.3d 1028, 1034 (9th Cir.

5    2007) (removing snow is "maintenance work" and the discretionary function does not apply).

6    Accordingly, the court finds the discretionary function exception does apply to the

7    negligence, nuisance and trespass claims.  These claims are dismissed.

8    **III.   MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**
9    **(SUPPLIER DEFENDANTS AND GOVERNMENT)**

10   **A.   Legal Standard**

11   Under Federal Rule of Civil Procedure 12(b)(6) a motion to dismiss argues the complaint

12   "fail[s] to state a claim upon which relief can be granted."  A complaint need contain only a

13   "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ.

14   P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

15   (2007).  But this rule demands more than unadorned accusations; "sufficient factual matter" must

16   make the claim at least plausible.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In the same vein,

17   conclusory or formulaic recitations elements do not alone suffice.  *Id*. (quoting *Twombly*,

18   550 U.S. at 555).  The court assumes all factual allegations are true and construes "them in the

19   light most favorable to the nonmoving party."  *Steinle v. City & Cty. of San Francisco*, 919 F.3d

20   1154, 1160 (9th Cir. 2019).  If the complaint's allegations do not "plausibly give rise to an

21   entitlement to relief," the motion must be granted.  *Iqbal*, 556 U.S. at 679.

22   **B.   Claims Against Supplier Defendants**

23   The supplier defendants move to dismiss the nuisance, trespass, and utility tampering

24   claims against them.  *See generally* PPG MTD.

25   **1.   Nuisance (Claim 3)**

26   The supplier defendants argue the nuisance claim fails because the complaints do not

27   allege the supplier defendants affirmatively acted to create the nuisance.  PPG MTD at 3.  The

28   supplier defendants contend it is not sufficient for plaintiffs to merely allege the supplier

1    defendants introduced "a product into the stream of commerce without warning of an alleged

2    defect." *Id*. at 1.

3        A nuisance under California law is "[a]nything which is injurious to health, . . . or is

4    indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere

5    with the comfortable enjoyment of life or property."  Cal. Civ. Code § 3479.  "Chemical

6    contamination of the soil that affects, or threatens to affect, water quality constitutes a nuisance."

7    *Team Enterprises, LLC v. W. Inv. Real Est. Tr.*, 647 F.3d 901, 911 (9th Cir. 2011) (citation

8    omitted).  California law holds both "the party who maintains the nuisance . . . [and] the party or

9    parties who create or assist in its creation [ ] responsible for the ensuing damages."  *City of*

10   *Modesto Redevelopment Agency v. Superior Ct.*, 119 Cal. App. 4th 28, 38 (2004), *as modified on*

11   *denial of reh'g* (June 28, 2004) (citing *Mangini v. Aerojet–General Corp.* 230 Cal. App. 3d 1125,

12   1137 (1991)).  "[P]roduct manufacturers may be liable under a public nuisance theory if they

13   create or assist in creating a system that causes hazardous wastes to be disposed of improperly, or

14   [ ] instruct users to dispose of wastes improperly."  *City of San Diego v. Monsanto Co.*,

15   No. 15-578, 2017 WL 5632052, at *7 (S.D. Cal. Nov. 22, 2017) (citations and internal quotation

16   marks omitted); *City of Modesto Redev. Agency*, 119 Cal. App. 4th at 43 (defendants "who t[ake]

17   affirmative steps directed toward the improper discharge of solvent wastes . . . may be liable" for

18   nuisance).  As relevant here, given the nature of plaintiffs' pleadings, "any failure to warn . . .

19   does not fall within the context of nuisance, but is better analyzed through the law of negligence

20   or products liability . . . ."  *City of Modesto Redevelopment Agency*, 119 Cal. App. 4th at 42.

21       Here, plaintiffs' allegations do not support a claim for nuisance.  Specifically, they allege

22   defendants "[f]ail[ed] to instruct consumers . . . as to means [of] preventing environmental release

23   . . . [and] [f]ail[ed] to warn of known defects inherent in Supplier Defendants' chromate

24   products."  *See Rio Linda FAC* ¶ 119 (b)–(c).  Plaintiffs also allege the supplier defendants

25   "[f]ail[ed] to conduct reasonable, appropriate, and/or adequate scientific studies" on the effects of

26   Cr6, and "[f]oster[ed] a market for Supplier Defendants' chromate products despite the known

27   defects and hazards inherent in their products."  *Id.* ¶ 119(a), (d).  Plaintiffs claim the supplier

28   defendants "fostered a market for th[eir] products by marketing and promoting them, and by

                                                16

1   concealing the potential for groundwater and drinking water contamination." *Id.* ¶ 87.  Plaintiffs

2   do not include factual allegations explaining how the supplier defendants marketed their products.

3   They provide no example of marketing materials to demonstrate the supplier defendants

4   "instruct[ed] users of [their] products to dispose of wastes improperly." *City of Modesto*

5   *Redevelopment Agency*, 119 Cal. App. 4th at 43.  Without these details, the operative complaints

6   allege merely that the supplier defendants "placed solvents in the stream of commerce without

7   warning adequately of the dangers of improper disposal" and marketed the products, which is not

8   sufficient to establish nuisance.  *Id.*

9        The court dismisses plaintiffs' nuisance claim, with leave to amend if possible.

10            **2.      Trespass (Claim 4)**

11       Next, the supplier defendants argue the trespass claim fails because the complaints do not

12   include sufficient allegations that "defendants took affirmative steps to cause a trespass."  PPG

13   MTD at 1.

14       Trespass requires "(1) the plaintiff's ownership or control of the property; (2) the

15   defendant's intentional, reckless, or negligent entry onto the property; (3) lack of permission for

16   the entry or acts in excess of permission; (4) harm; and (5) the defendant's conduct was a

17   substantial factor in causing the harm." *Ralphs Grocery Co. v. Victory Consultants, Inc.*,

18   17 Cal. App. 5th 245, 262 (2017), *as modified* (Nov. 6, 2017).  California law has established that

19   a "trespass . . . may include . . . invasion by pollutants." *Team Enterprises*, 647 F.3d at 912

20   (quoting *Martin Marietta Corp. v. Ins. Co. of N. Am.*, 40 Cal.App.4th 1113, 1132 (1995)).  "The

21   migration of pollutants from one property to another may constitute a trespass. . . ." *Martin*

22   *Marietta Corp.*, 40 Cal. App. 4th at 1132 (citations omitted).

23       The supplier defendants argue "there is no allegation that [d]efendants engaged in any

24   'affirmative steps directed toward the improper discharge of solvent wastes' that amounts to a

25   trespass."  PPG MTD at 6 (quoting C*ity of Modesto Redev. Agency*, 119 Cal. App. 4th at 43).  In

26   making this argument they rely on the case of *Team Enterprises v. Western Investment Real*

27   *Estate Trust,* No. 08-0872, 2010 WL 3133195 (E.D. Cal. Aug. 9, 2010).  *See* PPG MTD at 6. On

28   the one hand, *Team Enterprises* is distinguishable from the instant cases, as pled, because in that

17

1  case "Team's employees" used the products in question and "contaminated the soil by pouring

2  the wastewater down the drain[.]"  647 F.3d at 913.  Because Team's employees poured out the

3  solvents themselves, and "one cannot commit an actionable interference with one's own

4  possessory right," Team was unable to show an "unauthorized" entry for its trespass claim.  *Id*.

5  Here, in contrast, plaintiffs plead that the pollutants are present though no apparent action of the

6  supplier defendants.  *See* Rio Linda FAC ¶¶ 148–150.  On the other hand, however, "[n]othing

7  indicates that [the defendants] thrust [their] equipment onto the [plaintiffs'] property," *Team*

8  *Enterprises, LLC,* 2010 WL 3133195, at *18, or otherwise engaged in disposing waste onto that

9  property.  While plaintiffs may not have consented to the entry of any pollutants, they have not

10  alleged facts demonstrating the supplier defendants' intentional, reckless or negligent entry onto

11  plaintiffs' property.

12        The court dismisses the trespass claim, also with leave to amend if possible.

### 3.        Utility Tampering (Claim 7)

14        Lastly, the supplier defendants move to dismiss the claim for utility tampering, arguing

15  the statute does not provide plaintiffs a cause of action for water contamination.  PPG MTD at

16  1-2.

17        The California Civil Code allows a utility to bring a civil action for damages "against any

18  person who . . . [t]ampers with any property owned or used by the utility to provide utility

19  services."  Cal. Civ. Code § 1882.1(d).  Water is considered a "utility service" under the statute.

20  *Id.* § 1882(g).  "'Tamper' means to rearrange, injure, alter, interfere with, or otherwise to prevent

21  from performing normal or customary function."  *Id*. § 1882(e).  Plaintiffs' utility tampering

22  claim is based on the theory that the supplier defendants' actions led to the introduction of

23  chromium into plaintiffs' wells, impeding their "normal or customary function."  Rio Linda FAC

24  ¶ 193; PPG Opp'n at 12.  Defendants assert that contamination of groundwater, and by extension

25  a utility's well water, does not amount to tampering "with property owned or used by the utility"

26  under the statute.  PPG Reply 7–8 (quoting *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab.*

27  *Litig.*, 402 F. Supp. 2d 434, 439 (S.D.N.Y. 2005)).

28  /////

1    In interpreting a state statute, the court looks to "the [plain] language of the statute"; if the

2    text "is not ambiguous, the plain meaning controls and [the court need not] resort to extrinsic

3    sources to determine the Legislature's intent." *In re Jennings*, 34 Cal. 4th 254, 263 (2004)

4    (citations omitted) (interpreting Cal. Bus. & Prof. Code § 25658).  The court also considers the

5    "context with the entire statute and the statutory scheme." *Id.*  In interpreting section 1882.1 at

6    least two other district courts have found that groundwater contamination does not constitute

7    "tampering."  *See MTBE*, 402 F. Supp.2d at 438; *S. California Water Co. v. Aerojet-Gen. Corp.*,

8    No. 02-6340, 2003 WL 25537163, at *8 (C.D. Cal. Apr. 1, 2003).  In *In re Methyl Tertiary Butyl*

9    *Ether (MTBE) Product Liability Litigation*, "California Plaintiffs s[ought] relief from the actual

10   and/or threatened contamination of their water supply with the gasoline additive methyl tertiary

11   butyl ether." *MTBE*, 402 F. Supp. 2d at 436.  The plaintiffs brought claims under California Civil

12   Code section 1882.1.  *Id.* at 436 n.2.  The court interpreted the definitions appearing in section

13   1882 that govern section 1882.1 claims and found that the plain meaning of the term "property"

14   indicates it should be read to apply only to "tangible objects, and not legal rights" such as the type

15   of usufructuary water rights at issue here.  *Id.* at 439 (citing Cal. Civ. Code § 1882).  In *Southern*

16   *California Water Company v. Aerojet-General*, the plaintiff claimed the defendants' storage and

17   disposal of chemicals polluted the plaintiff's nearby water supply and impacted the plaintiff's

18   utility service performance in supplying public drinking water.  2003 WL 25537163, at *1.  In

19   that case, the court held that section 1882's definition of the word "tamper" did not encompass

20   groundwater contamination.  *Id*. at *9.  Both district courts found their interpretations and

21   conclusions were supported by the legislative purpose: to "deter the theft of utility services—not

22   to protect environmental resources." *MTBE*, 402 F. Supp. 2d at 441; *Aerojet-Gen. Corp.*, 2003

23   WL 25537163, at *9 (same) (quoting Sen. Comm. on Judiciary, Analysis of Assem. Bill No.

24   1285 (1981–1982 Reg. Sess.)).  The court finds these other courts' interpretations persuasive and

25   adopts them here.

26        In making their utility tampering claim, plaintiffs allege that the disposal of chromium

27   into the environment led to contamination of their wells.  *See* Rio Linda FAC ¶ 67.  They do not

28   /////

1   allege that defendants physically interacted with any tangible property, namely their wells or well

2   equipment, as the statute requires.

3          The court also dismisses this claim, but with leave to amend if possible.

4   **C.      CERCLA Claim Against Government**

5          The government moves to dismiss plaintiffs' attempt to recover CERCLA costs for failure

6   to state a claim.  U.S. MTD at 33.

7          CERCLA "provide[s] for liability, compensation, cleanup, and emergency response for

8   hazardous substances released into the environment . . . ."  *Carson Harbor Vill.*, 433 F.3d at 1265

9   (citation omitted).  To that end it creates a private claim for recovery of cleanup costs from

10  "persons who contributed to the dumping of hazardous waste at a site."  *Ascon Properties, Inc. v.*

11  *Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir. 1989); 42 U.S.C. § 9607(a).  To establish a prima

12  facie case for recovery, a plaintiff ultimately must show:

13          (1) the property at issue is a "facility" as defined in 42 U.S.C. § 9601(9);

14          (2) a "release" or "threatened release" of a "hazardous substance" has
15          occurred;

16          (3) the "release" or "threatened release" has caused the plaintiff to incur
17          response costs that were "necessary" and "consistent with the national
18          contingency plan"; and

19          (4) the defendants are in one of four classes of persons subject to liability
20          under § 9607(a).

21  *Carson Harbor Vill.*, 433 F.3d at 1265 (citation omitted).  The government challenges only

22  plaintiffs' pleading as to the third prong.  U.S. MTD at 35.

23          Response costs are "necessary when an actual and real threat to human health or the

24  environment exist[s]."  *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1003

25  (9th Cir. 2010) (citation and internal quotation marks omitted) (alteration in original).  Costs are

26  "consistent with the [National Contingency Plan or] NCP 'if the action, when evaluated as a

27  whole, is in substantial compliance' with [the NCP, which] . . . 'specifies procedures for

28  preparing and responding to contaminations.'"  *Id.* (citations omitted).  The EPA promulgates the

29  NCP, which "outlines specific steps parties must take in choosing a remedial action plan and

20

1   cleaning up hazardous waste." *Carson Harbor Vill.*, 433 F.3d at 1265.  Action is "consistent with

2   the NCP if the action, when evaluated as a whole, is in substantial compliance with . . . [certain

3   procedural requirements], and results in a CERCLA-quality cleanup."  40 C.F.R.

4   § 300.700(c)(3)(i) (internal quotation marks omitted).  As relevant here, "the [NCP] requires that

5   the party seeking recovery provide an opportunity for public comment and participation, conduct

6   a remedial site investigation, and prepare a feasibility study."  *Carson Harbor Vill.*, 433 F.3d at

7   1265–66 (citing 40 C.F.R. §§ 300.700(c)(5)(vii)–(viii), (c)(6)).

8          The government insists that plaintiffs have not adequately pled that the costs they incurred

9   to reduce the levels of Cr6 in their wells were necessary or that "any of the three requirements for

10   consistency with NCP" are met.  U.S. MTD at 34–35.  Plaintiffs respond that "consistency with

11   the NCP is a question of fact that is improper for resolution at the pleading stage."  U.S. Opp'n at

12   20 (citing *Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 840 F.2d 691, 695 (9th Cir.

13   1988); *see also Pinole Point Props., Inc. v. Bethlehem Steel Corp.*, 596 F. Supp. 283, 290 (N.D.

14   Cal. 1984)).  Plaintiffs have sufficiently alleged their costs were necessary because they claim the

15   concentration of Cr6 in their wells posed a health hazard if left untreated.  Rio Linda FAC ¶ 200.

16   Regarding consistency with the NCP, plaintiffs are correct that "under this statutory and

17   regulatory scheme, the question whether a response action is necessary and consistent with the

18   criteria set forth in the contingency plan is a factual one to be determined at the damages stage of

19   a section 107(a) action."  *Cadillac Fairview*, 840 F.2d at 695.

20          Plaintiffs' allegations regarding CERCLA recovery are sufficient; the government's

21   motion is denied as to this claim.

22   **IV.    CONCLUSION**

23          The court **grants in part the United States' motion to dismiss (Rio Linda, No. 17-1349,**

24   **ECF No. 129; Sac. Suburban, No. 17-1353, ECF No. 135).**  Plaintiffs' RCRA claim (claim 1)

25   and the state law claims (claims 2, 3, 4, 7) against the government are dismissed for lack of

26   jurisdiction.  The motion is **denied** as to the claim for recovery of response costs under CERCLA

27   (claim 8).

28   /////

1    The court **grants the supplier defendants' motion to dismiss (Rio Linda, No. 17-1349,**

2    **ECF No. 131; Sac. Suburban, No. 17-1353, ECF No. 137).**  The court dismisses the claims for

3    nuisance (claim 3), trespass (claim 4), and utility tampering (claim 7) against these defendants

4    with leave to amend if amendment is possible within the confines of Rule 11.  Any amended

5    complaint shall be filed within 30 days.

6    The requests for status conferences are **denied as moot (Rio Linda, No. 17-1349, ECF**

7    **No. 155; Sac. Suburban, No. 17-1353, ECF No. 161).**

8    IT IS SO ORDERED.

9    DATED:  August 18, 2022.

10

11   CHIEF UNITED STATES DISTRICT JUDGE

22